**2016 UT App 170**

# THE UTAH COURT OF APPEALS

ANNALEE POULSEN AND TROY POULSEN,
Appellants,
*v.*
FARMERS INSURANCE EXCHANGE,
Appellee.

Opinion
No. 20150498-CA
Filed August 4, 2016

Fourth District Court, Spanish Fork Department
The Honorable M. James Brady
No. 140300091

Denver C. Snuffer Jr. and Steven R. Paul, Attorneys
for Appellants

S. Grace Acosta and Alisha Giles, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGE STEPHEN L. ROTH and SENIOR JUDGE JUDITH M.
BILLINGS concurred.[1]

CHRISTIANSEN, Judge:

¶1     This case requires us to consider whether an insurance
policy covered water damage to a house without a complete
roof. We affirm the district court's summary judgment, which
rested on the conclusion that the policy did not provide such
coverage.

---

1. Senior Judge Judith M. Billings sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND

¶2    Annalee Poulsen and Troy Poulsen purchased a homeowner's insurance policy from Farmers Insurance Exchange to cover their primary residence. The policy generally excluded from coverage water intrusion into the house with certain exceptions outlined in a limited water coverage provision, which we refer to as the LWC Provision:

> We provide limited coverage for direct physical loss or damage to covered property from direct contact with water, but only if the water results from:
>
> (1) the build-up of ice on portions of the roof or roof gutters on a building structure;
> (2) hail, rain, snow, or sleet entering through an opening in the roof or wall of a building structure only if the opening is first caused by damage from the direct force of the following:
>     i.    fire;
>     ii.   lightning;
>     iii.  explosion (other than nuclear explosion);
>     iv.   riot or civil commotion;
>     v.    aircraft or vehicles;
>     vi.   vandalism or malicious mischief;
>     vii.  collapse of a building structure or structural part of the building structure;
>     viii. falling objects; or
>     ix.   windstorm.

¶3    In short, and as relevant to these facts, the insurance policy did not cover water damage unless the water entered through an opening in the roof caused by a windstorm. The LWC Provision further specified that temporary coverings were not to be considered as roofs, in a clause we refer to as the Temporary-Roof Exception:

The foregoing specified causes of loss are subject to the terms and limitations set forth in Section I . . . , for any such specified cause of loss or extension of coverage. *A roof or wall does not include a temporary roof or wall structure or any kind of temporary tarp, sheeting or other covering*.

(Emphasis added.)

¶4     In September of 2013, the Poulsens, with the help of their friends and neighbors, began replacing the roof shingles on their house. They removed the old shingles and an underlayment of black felt tar paper, exposing the plywood deck. The Poulsens then installed the new ice and water shield (the IWS) and underlayment. As the Poulsens installed the last two rolls of the underlayment, a sudden and severe storm arrived, bringing with it "gusting winds and torrential rains." The storm winds ripped the underlayment off the roof, allowing the rain to penetrate the house and damage both the structure and the Poulsens' personal property. The Poulsens filed an insurance claim, which Farmers denied.

¶5     The Poulsens then brought suit against Farmers, alleging breach of contract, bad faith, intentional infliction of emotional distress, fraud, and estoppel. Farmers filed a motion seeking summary judgment on the ground that the Temporary-Roof Exception applied because the plywood, IWS, and underlayment layers amounted to only a temporary roof. The Poulsens opposed that motion and submitted an expert witness affidavit. In the affidavit, their expert witness opined that the underlayment and IWS would have prevented water from entering the house had the windstorm not damaged them. The expert further explained that, because these two layers were intended to be permanently installed on the house, the covering was not a temporary roof or other covering. Finally, the expert stated that "underlayment without shingles is not a complete

roofing system, neither are shingles without . . . underlayment a complete roofing system per code. It takes both components to make the roofing system resistant to high wind, snow, ice and water."

¶6 The district court ruled that the insurance policy did not provide coverage for the house because, at the time of the storm, "there was no 'roof' as contemplated by the policy." Specifically, the district court stated that the combination of plywood, IWS, and underlayment "is not a roof at all" and that these components "constitute[d] only 'other coverings' until such time as shingles are installed." Because the LWC Provision only insured against water damage if the water entered through an opening in the roof created by a windstorm, the district court concluded that the absence of any roof at the time of the windstorm was fatal to the Poulsens' claims.[2] As a result, the

2. We note that the district court's summary judgment order was based on the lack of a roof rather than the temporary nature of the roof as had been urged by Farmers' motion for summary judgment. Therefore, this basis for summary judgment had not been presented to the district court. However, the Poulsens did not and do not contend that it was improper for the court to grant summary judgment on a basis not argued by Farmers.

The Poulsens had argued that the Temporary-Roof Exception did not exclude the combined plywood, IWS, and underlayment from the LWC Provision's limited extension of insurance coverage, because those were permanent components of a roof. But neither party asked the district court to consider whether a partially completed roof qualified as a roof so as to trigger the LWC Provision in the first place. Consequently, the district court never considered whether the insurance policy's use of the word "roof" included incomplete roofs, i.e., whether the LWC Provision still had application even in the face of the court's determination that the roofing system was incomplete.

(continued…)

district court granted summary judgment to Farmers, but denied Farmers' request for an attorney fees award. The Poulsens appeal.

ISSUES AND STANDARDS OF REVIEW

¶7      The Poulsens contend that the district court erred by concluding that the plywood, IWS, and underlayment did not constitute a roof for purposes of coverage. They further contend that the district court erred by concluding that the component parts covering their house at the time of the severe storm amounted to only a temporary roof. And the Poulsens contend that the district court erred by improperly resolving material factual disputes before concluding that the insurance policy did not cover their house due to its condition on the day of the storm.

¶8      Summary judgment is only appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(a); *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 6, 286 P.3d 301. Accordingly, we review a district court's grant of summary judgment for correctness, affording no deference to the court's legal conclusions. *Basic Research, LLC v. Admiral Ins. Co.*, 2013 UT 6, ¶ 5, 297 P.3d 578. When contract provisions are clear and complete, the meaning of the contract can appropriately be resolved by the district court on summary judgment. *See id.* "The interpretation of a contract is a question of law that is reviewed for correctness, giving no deference to the district court." *Id.*

---

(…continued)
The district court's order thus reflects its unchallenged belief that the incomplete nature of the roofing system precluded coverage under the policy.

ANALYSIS

¶9     Utah has a longstanding commitment to "[t]he principle that 'insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance.'" *United States Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 521 (Utah 1993) (quoting *Richards v. Standard Accident Ins. Co.*, 200 P. 1017, 1020 (Utah 1921)). "[I]n case of ambiguity, uncertainty, or doubt, the terms of an insurance contract will be construed strictly against the insurer and in favor of the insured, and . . . the insured is entitled to the broadest protection that he could reasonably believe the commonly understood meaning of its terms afforded him." *P.E. Ashton Co. v. Joyner*, 406 P.2d 306, 308 (Utah 1965). "It follows that ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage." *Sandt*, 854 P.2d at 522.

I. Whether There Was a Roof

¶10     The Poulsens first contend that the district court erroneously determined that the plywood, IWS, and underlayment did not constitute "a 'roof' under the Farmers insurance policy, as a matter of law." They assert that the LWC Provision "contrasts 'roof' with 'wall'" such that any "part of [the] structure on top of the walls" is a roof and any "part of [the] structure under the roof" is a wall.[3] Thus, in the Poulsens'

---

3. The LWC Provision extended insurance coverage when water entered the house "through an opening *in the roof or wall* of a building structure only if the opening is first caused by damage from the direct force of [a] windstorm." (Emphasis added.) The windstorm tore a hole or opening in the underlayment layer but apparently did not create any holes in the plywood layer. Because the district court concluded that component layers did

(continued…)

view, the plywood, IWS, and underlayment constituted a roof within the meaning of the LWC Provision.

¶11    The Poulsens concede that, at the time of the windstorm, this "roof [was] in a state of partial completion" due to the absence of shingles, but they argue that the LWC Provision "does not say anything about the state of completion." The Poulsens essentially argue that the presence of a roof, albeit an incomplete one, entitled them to coverage under the LWC Provision because the rain "enter[ed] through an opening in the roof . . . caused by damage from the direct force of" the windstorm.

¶12    We construe language in an insurance policy in favor of coverage when a crucial term is "fairly susceptible to different interpretations." *See Sandt*, 854 P.2d at 522. But the word "roof" in such a policy is not fairly susceptible to interpretation as meaning an incomplete roof.

¶13    Layers of plywood, IWS, and underlayment covered the Poulsens' house at the time of the windstorm. The Poulsens accept that this roof was only partially complete due to the lack of shingles. And the Poulsens' memorandum in opposition to summary judgment included an affidavit from their expert witness explaining that the "underlayment without shingles is not a complete roofing system" because "[i]t takes both components to make the roofing system resistant to high wind, snow, ice and water." On appeal, the Poulsens do not identify any authority suggesting that component parts of a roof that

---

(…continued)
not constitute a roof at all, it did not address whether the uncompromised nature of the plywood layer meant that the water did not in fact enter the house through a windstorm-created opening.

together fall short of a complete roofing system could fairly be considered a "roof" for purposes of a homeowner's insurance policy. Nor do they point to any authority to the effect that an insured "could reasonably believe the commonly understood meaning" of the word "roof" in an insurance policy encompassed an incomplete roof that was unable to resist wind, snow, ice, and water.[4] *See P.E. Ashton Co. v. Joyner*, 406 P.2d 306, 308 (Utah 1965) (holding that "the insured is entitled to the broadest protection that he could reasonably believe the commonly understood meaning of [the terms used in an insurance policy] afforded him"). Thus, although we are bound to construe ambiguities in an insurance policy in favor of coverage, we are unable to identify any uncertainty in the LWC Provision's use of the word "roof".

¶14    The Poulsens have not shown that the insurance policy's use of the word "roof" was fairly susceptible to interpretation as including incomplete roofing systems. We therefore hold that the district court did not err by concluding that the layers of

---

4. *Cf. Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co.*, 2008 OK CIV APP 8, ¶¶ 10–11, 176 P.3d 1232 (holding that "a roof is a unified product comprised of all its component parts and materials, including felt [underlayment], flashing, sheathing (decking), valleys, nails, caulk, drip edges, and shingles" and therefore rejecting an insurance company's argument that, because asphalt shingles were a second and separate roof from the layers beneath them, it was only obligated to pay for hail damage to the "upper roof" made of asphalt shingles); *Dewsnup v. Farmers Ins. Co. of Or.*, 239 P.3d 493, 499 (Or. 2010) (stating that "a roof should be sufficiently durable to meet its intended purpose: to cover and protect a building against weather-related risks that reasonably may be anticipated" and that "the meaning of the term 'roof' is sufficiently plain that we need go no further to define its meaning").

plywood, IWS, and underlayment did not constitute a roof within the meaning of the insurance policy.

## II. Whether the Roof Was Temporary

¶15    The Poulsens also contend that the district court erred by concluding that the plywood, IWS, and underlayment constituted only a temporary roof or temporary covering. They further contend that the district court erred by weighing competing evidence as to whether the elements in place at the time of the windstorm were temporary. Specifically, they argue that the district court "disregarded testimony that the home was not covered by any tarps or other temporary materials during the severe rain storm."

¶16    Both of these contentions misread the district court's stated rationale for granting summary judgment to Farmers. It is true that the court stated that the plywood, IWS, and underlayment "constitute[d] only 'other coverings' until such time as shingles are installed." But the court did not rule these layers made up a temporary roof that the Temporary-Roof Exception would exclude from the LWC Provision's coverage. Rather, the court ruled that no roof, temporary or permanent, existed at the time of the windstorm, and thus that the LWC Provision did not come into play at all.

¶17    The insurance policy proper did not cover damage caused by water entering the Poulsens' house. As relevant here, the LWC Provision modified that baseline rule to cover such damage if the water entered through an opening in the roof caused by a windstorm. And the Temporary-Roof Exception limited the modification by providing that the LWC Provision did not apply if the windstorm-created opening was in a temporary roof.

¶18    The district court acknowledged that both parties had "asked the court to rule on whether the plywood,

[underlayment,] and IWS constitute a temporary or permanent roof," i.e., whether the windstorm-created opening was in a temporary roof such that the LWC Provision was negated by the Temporary-Roof Exception. But the court explained that, "[u]ntil the roof is complete, there are only individual components." As a result, it concluded that these components were "not a roof at all" and that "there was no 'roof' as contemplated by the policy." In essence, the court determined that the absence of a roof foreclosed any analysis of the LWC Provision and the Temporary-Roof Exception because, if there was no roof, water could not have entered through a windstorm-created opening in the roof.

¶19   Because the Poulsens' second and third contentions challenge conclusions that the district court either did not make or which were not part of its ratio decidendi, we need not and do not address them further.


CONCLUSION

¶20   The Poulsens have not demonstrated that the insurance policy's use of the word "roof" is "fairly susceptible" to interpretation, *see United States Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 522 (Utah 1993), as encompassing a roofing system "in a state of partial completion." Accordingly, we see no error in the district court's conclusion that, at the time of the windstorm, the Poulsens' house had "no 'roof' as contemplated by the [insurance] policy." Because this conclusion was a sufficient basis for the district court to grant summary judgment to Farmers, we decline to address the Poulsens' other challenges.

¶21   Affirmed.

_____